is for today is actually Papa, I believe, or Poppa versus Harriet Carter gets number 21-2203. Council, would you like to reserve some time for rebuttal? Yes, your honor. May I have five minutes for rebuttal? That'll be granted. You may proceed. Your honor, may it please the court, my name is Gary Lynch. I represent the appellant in this case, Ashley Poppa. The district court erred in this case in ruling that there was no interception under the Pennsylvania Wiretap Act. Navistone, who we allege is the interceptor, was not a direct party to the relevant communication here. And the relevant communication is the interaction between Poppa and Harriet Carter's website. Poppa had no idea that Navistone even existed. And as this court has held in the Google case, and has indicated in the Google case, that a party to a conversation is one who takes part in the conversation. And that, by definition, means that one party that's conversing has to know about the existence of the other party. Well, of course, this isn't an ECPA case at all. It's the Pennsylvania WESCO statute that we're dealing with. It is. But the definition of intercept is basically the same. And the relevance of being a direct party is, for that purpose, is going to be the same. Now, obviously, the relevance for being a direct party under the federal Wiretap Act is much different. The consequence of being a direct party is much different. But the district court here had to first establish that Navistone was a direct party as a jumping off point for the analysis that it then did under the definition of intercept under the Pennsylvania statute. Can we jump right into it? You know, we've got the WESCO statute, a series of cases, DeSilvio, Proeto, and then Crutenden. Then comes this 2012 amendment to the statute. Yeah. But does that affect the force of the Crutenden Pennsylvania Supreme Court decision? In other words, does the amendment change it at all? So that is the question that the court asked us to submit a letter brief on, and we have. And I'll answer that question right up front. But I don't want to forfeit my ability to then show that these cases are distinguishable anyway. Okay. But procedurally, I think it does, Your Honor. And I think it really has to do with the district court's ability sitting under the- What did the 2012 amendment do? Did it just basically codify the law enforcement exception? It did. And so I think that gives us then the question of what is the usefulness or what is the ability of a district court under the Erie Doctrine trying to predict Pennsylvania law or determine Pennsylvania law, what is the ability of a district court to extend a court decision by analogy once the holding of that decision has been codified, right? And that's the question that I was trying to address in our letter brief. I don't think the district court has the ability. Setting aside whether it was proper to do so, I don't think the court has the ability to extend by analogy that Supreme Court decision after the holding has been codified because the court's role under the Erie Doctrine is to determine Pennsylvania law. But haven't courts since, Cruton, cited it? I mean, I take it your argument is we don't even need to rely on that anymore. But court, I can think of at least one decision that has cited it. Sure, courts have cited it. But courts have not attempted to extend it by analogy to a civil context like this and to extend it by analogy to a situation that does not involve the direct communication between two parties. All those three courts, the Cruton decision and even the two Superior Court decisions that came before them, those were situations where a police officer was having direct communication with the sender of the information. There were only two parties to the communication at all times. There was never a third-party alleged interceptor. The policemen were sitting basically in the shoes of the other party to the communication. I think we know the facts there. We know that it was law enforcement. So you're saying DeSilvio, Proeto, Cruton, all those cases, they don't inform us in any way as to a non-law enforcement case? It's the same statute that they're dealing with. Sure. Like I said, I don't want to get caught up on what I think is a procedural limitation now being placed on or an eerie doctrine limitation being placed on the district court. I don't want to get caught up in that and overlook the fact that it's improper to use these cases anyway by analogy because they're factually dissimilar. Here we don't have a two-party communication going on by deception. In every one of those cases, the sender of the information intended to communicate with the receiver of the information. They just didn't know who they were talking to. That's not the case here. We have a three-party communication here, and it's a typical wiretap situation where you have two parties communicating and a third party intercepting. That's not the fact pattern of any of those three cases. It was incorrect for the district court to extend them by analogy just on their face. How do you respond to your adversary's argument that the vast majority of commercial websites employ similar tracking? This wasn't really deceptive in the sense of it never happened before. I mean, under your interpretation, wouldn't all similar services constitute an interception? Well, I think we have to ask, and I think what the defendant is flat out saying is that there's an ultimate defense that this is just how the Internet works. And I think the court's question that's being presented to the court today is how far is that going to go? How far do we go with this idea that the gloves are off once you're on your computer in terms of wiretap protection? And I would suggest, and I would like to suggest, that there are limitations as courts have determined throughout the country, mostly under the federal wiretap, but it's the same definition of intercept. But there's a limitation, and I think the limitation is really stated by Judge Fuentes in the Google decision, where if I may be, and just first, the Google decision is much different than this case, because as the court held, as this court held in Google, or indicated in Google, the communications there were happening in the ordinary course of rendering the website for a website visitor. So these communications, as Judge Fuentes wrote, were happening anyway. So that's why they were determined to be direct communications. They were known. They were happening anyway. And the placement of a cookie to track was happening incidental to communications that were already happening. It was almost unnecessary, as Judge Fuentes pointed out. Well, can you tell us how the associative cookie in the Google case differs from Navistone's one-tag software? Yes. And if I could be indulgent, Judge Fuentes. And its privacy policy. Deal with the one-tag first, but also and its privacy policy. Excuse me, Your Honor? And its privacy policy here. Yes. That has to do with consent. The one-tag is basically spyware. It's not just a tracking cookie. Okay? And Judge Fuentes, if he'll indulge me in letting me read a portion of his opinion back to him, actually identified the situation that this court, they actually contemplated, this court contemplated the fact situation that this court now has in front of it as distinct from the circumstances that occurred in Google. And here's the sentence that explains that. If the information at issue was not sent to defendants in the ordinary course, mere identification cookies would not be sufficient for the defendant's scheme. To accomplish their tracking in that instance, the defendants would have needed to, not an associative device, but one capable of capturing communications sent by the plaintiffs and intended for first-party websites and then transmitting them to the defendants. And they cite the PharmaTech decision out of the First Circuit for that fact pattern. That's the fact pattern we have here, and that's the fact pattern that this court identified is different than the situation in Google. Navistone's only purpose for being involved with any communications with POPA was for the sole purpose of deploying the spyware. They had no involvement whatsoever in the rendering of the website. There were not direct communications going back and forth between POPA and Navistone that were incidental to the website visit at all. Now, they happened concurrently with the website visit, but they had no involvement with it. That's a huge distinction. It's a dispositive distinction, I would suggest, from the Google decision. And that's the line. Judge Chigars, you asked me, is this going to basically criminalize the Internet? There's the line. Wasn't a POPA's browser sending the GET request to Navistone? It was. And the fact that the mechanics of the technology to convey information over the Internet is a GET request is not enough to make this the same case as Google. The fact that there were GET requests used in both instances doesn't make this an analogous case. The GET request was for the purpose of doing two things, installing the spyware and then delivering the payload that the spyware captured. That's what the GET requests were used for. The nature of the mechanics doesn't change the fact that this is a classic wiretap situation. There was no other communication going on, and that's the distinction from Google. The defendant, at least here, argued that there was no interception under the act because your web browser was communicating directly with Navistone. Do you have a response to that? I do. And I don't mean this to be in the least bit facetious, but every time an eavesdropper establishes the device and deploys the device and activates it, there is always then a direct communication between the sender and the eavesdropper. If they're suggesting by virtue of the fact that they were able to put a device on POPA's web browser and then establish that direct connection and flow of information to them, that that's an exception under the statute, the statute's then been completely eviscerated. Eavesdroppers aren't direct communicators. They're eavesdroppers. Can you also address the privacy policy? There's a question of fact as to what the policy even was at the time POPA... What is the question of fact? Did it exist at that time? I think a policy may have existed. POPA never testified she never saw it, and we don't know the substance of it because the 30B6 witness, and I can give you the record site of the deposition very quickly. You can do it on rebuttal. Indicated they could not tell what the actual substance of that policy was at that time. But even if we knew the substance of it, and even if it was the same as the one that was on their site subsequently, I think there's at least a question of fact about whether simply burying that type of a consent or that notification in a policy that does not require acknowledgement of having been read and an actual consent to having this type of interception occur, I think that there's a question of fact about whether that constitutes consent under the statute. That's pretty much become standard today, right? You and I, when we go on, we use cookies. Do you agree that we? It does, Your Honor. Stop reading. And I'm usually confronted with that in the context of arbitration clauses and class action waivers and the super law of the FAA. This isn't that. This is privacy. And to say that you've waived all of your rights to privacy by getting on a website in that type of way, in that type of click-wrap format, I think goes too far. And we don't, as I said, in this case in particular, there's at least a question of fact over it because we don't even know what that consent would entail, what that language of that policy even said here. But I think a broader question exists as to whether or not that type of notification is sufficient for this statute. Judge Fuentes has another question. There is an argument made that if we rule in your favor, millions of websites in Pennsylvania will be guilty of wiretapping, maybe even criminally. Can you respond to that? Well, my first response is if I'm having to argue policy as the appellant, I'm winning. I don't see that. I don't think in those terms. I think we have a plaintiff here that was a victim of a wiretap, and we were trying to pursue that claim. I don't know the consequence or the significance of the fact that there may be many, many, many other perpetrators or violators of this statute. I do know the statute provides, as Judge Ambrose has now pointed out, that there is a way to do this. If you want to collect this type of information on the Internet, there's a way to do it in compliance with Pennsylvania statute, and that is get the two-party consent that's required. And if somebody really wants to get on Harriet Carter's website — Are you suggesting over the Internet itself? I think that's possible. You would not be allowed access to the website, to shop on Harriet Carter's website, unless you agree — and they have to specifically lay it out as a pop-up that you have to get past by reading and then agreeing to — that you're going to be monitored, your clicks are going to be monitored, the Web pages that you navigate through will be monitored. That's a consent. All that information has to be given to the shopper in order for the shopper to be insulated from any further problem. I would think so, Your Honor, because otherwise, what does consent mean under the statute? I mean, you can imply consent, and that's part of their argument here, of the idea that this is a direct party. I mean, they are almost suggesting that all Internet communications, because of the nature of those communications, are necessarily permanent, are necessarily recorded, and therefore, if you're a direct party to that communication, it's understood. And now there's two-party consent. I'm just thinking out loud about it. And so the thing would be that they would have to post like a — maybe a warning to the shopper. By the way, you're shopping here. Your information may be shared with other websites. Thank you. Well, it's no different than how it's handled in a phone conversation. It doesn't seem likely that that would ever happen. Well, it happens in the phone context all the time, where you call up a company that wants to record the conversation. They tell you right up front, if you proceed with this conversation, it's going to be recorded. If you proceed with the conversation, you've consented to the recording. I don't see how this would not be the electronic equivalent of that on the Internet, to tell somebody, if you proceed to get on our website, we're going to be recording your navigation of our website and your choices that you make and your clicks and your URL and everything else. That's the impression I got from what you were saying before, so that they should warn the shopper, by the way, information you provide may be shared with other websites or other individuals that are shopping for the same product. Well, I think literally under the statute, Your Honor, they have to get consent to intercept the information. I mean, literally. So the analogy, I think, is a strong one to the phone conversations, right? You're saying, I'm going to record your phone call. What they're going to do with that recording is a separate question. They have to get consent, but they're not getting consent currently. I don't believe they've gotten consent in this case, certainly, no. Thank you, counsel. We'll hear you on rebuttal. Thank you. And we'll hear from your friend. I believe it's Mr. Bertone first? Yes, Your Honor. Okay, great. Welcome. Before we start the time, can I ask how you're splitting your time? Yes. Navistone, who I represent, will be getting 12 minutes of time. No, no, substantively. Oh, substantively. There are some issues relating to Harriet Carter's independent theory of liability regarding wiretapping. My brother will be addressing those. Great, great. It's your call on the mask. It's up to you whether you want to leave it on or not. Thank you, Your Honor. I want to begin with the Google case, because the Google case is one— Not your name. Oh, David Bertone from Brandon, Isaacson, in Lewiston, Maine. And I've got David Sweatman-Berlin, my partner, as well. Okay. And I grew up not far from here in Pennsylvania, so it's a joy to come back on an important case. Well, you're still an Eagles fan. Pardon me? You're still an Eagles fan? I am. And I also was and remain a Philadelphia Flyers fan. And you can imagine how those pan out in New England. So first question— And I obviously here view oral argument as a partnership arrangement, because these are interesting issues. And they're issues that I think collectively— you know, my arc bore in the trenches in this case that has arrived us here, has brought us here, I think provides some insights that may have been blurred over in my brother's argument. The first issue I wanted to address is the Google case. It is not distinguishable. And if you look at the complaint in the Google case, the allegation was that Google collected information and used that information to enhance a database that led to the targeting of advertisements on other websites. That is Google's mode of operation. It does two things. One, it gathers data using JavaScript, sends it to its server, and that server then either combines it in a larger database to serve ads for a bunch of clients, or it reports back to the website owner on website usage patterns. The technology is identical. The transmittal of information is identical. The presence of Google's code on the website is no different than assigning to an agent the collection of information on behalf of a retailer. And so in that context, at the very terminal point of discovery, plaintiff's expert witness was led through this argument and then asked to opine if plaintiff's counsel's website under this theory was guilty of wiretapping. And he concluded that it was under this theory because their theory of wiretapping is in fact ubiquitous. Any time there is JavaScript that sends information to a third party, their theory would be it is a criminal activity. And if you look at the website of the Pennsylvania Assembly, if you look at the website of the Pennsylvania Attorney General's office, if you look at the federal court websites, all of them have Google code that is transmitting browsing data to a third party, Google. And to give you a sense as to how ubiquitous this is, there are very many retail websites, from the small fly tying shop in Maine that produces custom flies to a retailer that has a website that sells collectibles. Most of those websites are on third party servers. For example, if you build a website on Wix, your communication is not with Joe's fly fishing shop. It's with Wix. It's with a third party server. But does it matter that a party like a popa, just a person going on, would not be aware that Navistone was communicating with her browser? You know, it's an interesting and important question. I mean, it may be happening, but maybe someone doesn't realize it. Well, Google and Nickelodeon were important, I think, in the respect that they acknowledge that the unique modality of a website involves communications with servers performing a wide variety of functions. And let me explain why I think this rule effectively leads to what, and we'll get to the Diego case in a moment, because I do want to address that, why it leads to an absurd result. Almost every website that is commercial in nature, and many governmental websites, have JavaScript that retrieves images, for example, that are then placed on the website. Those get requests include the website address, the page that the visitor is on, the IP address of the visitor's browser. They include a bundle of information that allows the recipient server to know what computer is visiting and identify them down to the IP address. And what is the purpose of that? The purpose of that is to populate the webpage with content. That's one narrow purpose. But those kind of third-party get requests can be undertaken for a wide variety of purposes, to process a payment, to allow a website owner to know how its website is being used. Is it not used to, for example, continue to sell products to the individual? Oh, it is, Your Honor. And so that, for example, my original work in direct marketing was pre-Internet age. And so catalog sellers, by analogy, collect a lot of information about individuals, and it helps them determine who to market to. And that's the essence of what Navistone does here on behalf of Harriet Carter. And I must say that there was an example given about a telephone operator picking up the phone. Well, most of those telephone operators are not employed by the retailer. They are third-party service companies. And if they're not recording the call, there's no need to give any announcement. In oral communications, the recordation is essentially an interception. But in the Diego case, 2015, the court said it would create a parade of absurdities to make the recipient of a communication essentially be engaged in wiretapping. And I wanted to note that in connection with this case, in connection with the statement of material facts that went back and forth between the parties, it was admitted that these are direct communications to Navistone. There was no ambiguity about that. And that those direct communications fall precisely under the Google analysis. And the benchmark rule in Pennsylvania has always been, since at least 1975, that the recipient of a direct communication is per se not engaged in wiretapping. This is not a close case. There are close cases in other jurisdictions where there may be software that is instantaneously copying communications that are going to the website host. That it does not occur here. Facts show that it doesn't. These are independent communications that are the result of independent activity by the software in question. I asked your friend about the body of Pennsylvania cases. And, of course, there was an amendment. Do we still apply? Do those cases have any applicability at this point? Yes, Your Honor, I believe they do. And in undertaking an analysis of what the Pennsylvania courts would do, we have the 2015 case involving Diego. Diego went through a bunch of issues, and then the court sua sponte identified the one that I think is dispositive here, which is that an individual private party who answered a communication was a direct recipient and thus fell outside of the wiretap act. And we've got the Rosa case, which confirms that a direct recipient falls outside the definition of intercept, and the question of party consent is irrelevant. Now, I should add, by the way, there was some colloquy about putting up a web notice seeking consent. And in this case, it was only a matter of days after their own expert had told Ms. Popa's counsel that you were engaged in interception, criminal interception, that a pop-up appeared on opposing counsel's website. These are the folks who invented this idea. They're the ones who have accused websites of engaging in wiretapping, and then it turns out that their own website is rife with call-outs to third-party servers, including third-party ad network servers. And so the question becomes, for my purposes, and what I think is important to my client, is that a core principle of direct recipients not intercepting, has that principle been uprooted by a narrow amendment that deals with law enforcement and misrepresentation? I would argue that if the legislature was intending to uproot that longstanding principle, it wouldn't have done so with such a surgical pronouncement. And that surgical pronouncement, by the way, came out of the lower court decision in the same case, which itself demonstrated that the direct recipient argument and position survived. It distinguished Pareto on the ground that Pareto, the officer was essentially impersonating a fictional character, the 14-year-old underage chat room participant. Well, there, in those cases, there was direct communication between the officers and the person who was being intercepted. There was, Your Honor. My biggest, you're hitting on it, the biggest concern is Wesco. And I think, Your Honor, the interesting thing about the Pareto case is that this was in a chat room. And in a chat room, any number of people can be participating and observing. But was Pareto codified in the 2012 amendment? Well, that's a very good question, Your Honor, because I think that it was implicitly codified to suggest that Pareto's recognition of the direct party exception, but saying in an instance where there's misrepresentation it doesn't apply, suggests that it was not meant to occupy the field of direct communications. It wasn't meant to wholesale root out the basic initial inquiry. Do we have a direct communication? If we do, that ends the analysis. If we don't, we move on to whether it's an interception or not. And so, yes, Your Honor. Okay. So in this instance. My problem is that it looks like the amendment is just a law enforcement exception, because normally Wesco requires all parties to consent, right? It does, Your Honor. And the question here is if now we have this 2012 amendment, which deals with law enforcement, and obviously this case isn't law enforcement, do we then not have an exception? Well, Your Honor, first of all, the direct communication analysis has nothing to do with consent. Combs v. Rosa makes clear in a way that the other courts have implied that you don't get to the consent issue unless you've first shown an interception. Well, just in the real world, if you're Ms. Popa, how do you make it understood that if I'm browsing on a Harriet Carter website, I don't want other people snooping on my browsing on this Harriet Carter website? Is there a way that she can look at the stuff on the Harriet Carter website without being outed to other commercial entities? Well, Your Honor, it's an interesting question. And one of the core issues here is what happens when you communicate with a corporation that is selling online. You're not communicating with Ms. Harriet Carter. She's long deceased. You're communicating with a company, and the company has agents. It has employees. And one of the agents it has are the folks who are doing digital analytics for it. One of the agents that it has are those who are providing graphic images. Another agent can be the payment processor. And so when you go online, and I think the Google case was quite clear about this, as was Judge Stickman in his decision, that going online is not like having a conversation with your neighbor.  It is visiting a commercial marketplace in which companies require third parties to act on their behalf and be receiving information on their behalf. I think that's fine, but are the parties informed that that is taking place? Your Honor, there was no law that dictated how parties could disclose what they're doing on the web. There was an evolutionary process that occurred. And at the time of this case, there was a privacy policy. And I would argue that it clearly discloses what is being collected and the purposes for which it is being collected. You know, there is really no factual controversy about what policy existed at the time. There's a declaration in the record on that point. If I go online and, let's say, I'm basically shopping or buying something, and I do order something, you make a recording or you capture that information because you might want to send me e-mails to see if I want to buy something else. That's right. And one of the misunderstandings... But that's my question. Shouldn't I be told that that activity is taking place? Well, you know, it's an interesting question. I think over time, iteratively, I think that the knowledge that a website server is receiving communicative data, that happens all the time. There's no data that is ultimately received by Navistan that wouldn't also be received by Harriet Carter. And one of the interesting things about this case, Your Honor, it's one of the things that I thought, you know, why are you targeting Navistone? Navistone only exists because Harriet Carter could have done the same thing. It could have received the data and then used it to send postcards. But Navistone's presence in this case is to separate the browsing data from any kind of name and address identifier so that Harriet Carter never knows who's visiting its website, but it's able to deliver them postcards. This is the fundamental irony for me here, is that all of this information and all of the technology has been separated into silos here for the purpose of preserving anonymity online. And, you know, should individuals understand how websites operate under the hood? The reality is there's lots of technology that we rely on, that we don't know precisely how it works. But I think it's a fair statement to say that when people deal with a company, they deal with third-party service providers. They deal with agents and employees. When you call in to place an order, as I mentioned. Do you advise or alert the callers that this is actually taking place, that your information may be recorded and may be used for other purposes? Well, Your Honor, in this instance, there is no upfront indication to the website visitor that anything is being recorded. Information on the web is sent in alphanumeric data and received in alphanumeric data. It is inherent in the web browsing process that the hosting website retailer is, I think that my time may be up. It is, but that's okay. I'm so sorry for overlooking that. That's okay. There is a flow of alphanumeric data back and forth. And what's interesting is that the data that ultimately Navistone is able to, after the website page is loaded, it obtains data. That data all originates from Harriet Carter. It's the Harriet Carter's response to the browsing that provides that data into the browser. The transfer is instantaneous, really, right? Well, instantaneous may mean different things to different people. But in the context of programming, Navistone injects a meaningful delay, and a meaningful delay is something more than microseconds. And there is a delay that's intended to provide so that the communication from Harriet Carter's server back to the web browser is completed. It's on page load. I guess my point is it's not enough time to allow a user to say, I don't want my information. Well, that's right, Your Honor. And just like so many things that happen and that we expect to happen when we visit a website, I'll give you an example. So there are many third-party companies that serve as virtual shopping carts for smaller retailers. If you build a website on Wix, your website is hosted on Wix, and one of the services it provides is a stream of communications that allow that shopping basket to remain populated as you go from page to page. That identifier is a cookie that is used to link the visitors across the site. One of the interesting things that their expert agreed on, by the way, and I think this is important, is that the operation of Navistone software does not occur absent the permission of the user's web browser. And let me explain. You're going to have to make it short because you're way over time. But when you select a web browser, it has settings, and you have the control over those settings. And the reason they default to a certain kind of information exchange is that that's what visitors want. The functionality of websites depends on these third-party communications, and without it, you'd know in a second and probably wouldn't be happy as a consumer. There are settings that can prevent third-party communications from occurring. You can block JavaScript from running. You can eliminate cookies so you can't be identified. You can also employ third-party ad-blocking software that prevents third-party communications. These are all out there. They're tools. But Navistone and the rest of the web requires the browser to give permission. Now, you may not be educated enough as a consumer to know that you have those choices, but they're part of the system too. And our expert, I thought, was quite compelling in that absent these evolutionary communications processes, the web would not exist as we know it today. Now, as we move forward, states like California are imposing affirmative up-front disclosure requirements, and companies are complying. This case dates back to 2018. And let me be, I don't want to be sky-falling, but we're talking about retroactive liability here, back to a time when no one had pop-up screens, back to a time when Harry Carter was at the cutting edge with its disclosure in its privacy policy. And this plaintiff chose not to read the privacy policy, but I can tell you what else she admitted, that even after filing this lawsuit, even after knowing of the existence of privacy policies, she continues not to read them. And in some respects, companies who are not engaged in anything nefarious, these are their agents helping them perform their business, ought not be caught up in someone who blithely surfs the web and then later claims, you know. Look, we all blithely surf the web for various things. Maybe I go on for golf equipment or Notre Dame football or something. People do it all the time. But not everyone files a class action, a bankrupting class action. Because she probably cares more than most others about her privacy, and that's why we're here. Certainly no district attorney, as they have admitted in oral argument in Pennsylvania, has ever made this argument. And there's going to be a new cottage industry of suing every organ of state government if this is a wiretap, because you've got every prosecuting office in this state engaging in the same communicate. I come back to you. The question is, how does WESCA apply or not apply? And I think the answer we've been through, so. We'll beat on it, so. Thank you, Your Honor. Can I ask you one very narrow question? An interesting opinion from your First Circuit is the PharmaTrac case. And my question is this. Are there any differences in the technological processes employed by your client here and those used by PharmaTrac, or the data collected? You know, it's interesting, because most of these cases, unfortunately, were decided on motions to dismiss, and so you have to accept the complaint allegations as true. And it leads to, well, we have a rare instance here where we have a look into the actual facts as developed through discovery. PharmaTrac apparently had a technology that could monitor communications going on between a visitor and the website it was visiting, capture those, duplicate them, and instantaneously deliver them to two destinations. Our expert said that it is possible to reprogram JavaScript to do so, that JavaScript has some underlying command centers that allow you to do that duplication, and that's what was going on in PharmaTrac, instantaneous duplication of communications between two other people. In this instance, Navistone has no access to those communications. Our expert made clear that they didn't access them through JavaScript. What they were doing is after those communications had concluded, they were collecting subsets of data at the direction of Harriet Carter and analyzing that data for marketing purposes. Thank you, counsel. Is there, like, an advisory on your website, on the website that tells a potential shopper that your information may be used for further marketing purposes? There is, and there was one on this website as well, Your Honor, in the privacy policy. On yours, you're saying? Pardon me? You said this website. In Harriet Carter's website. And Navistone also has it on his website. Was there one on the website at the time that Ms. Polk had visited? Yes. We have a declaration to that effect. Now, a third-party witness, a 30B6 witness, was called to confirm what had already been sworn by declaration, and in that deposition expressed some uncertainty. Well, it's kind of important because if the shopper or the person that goes on the website knows that their information may be used for further or additional marketing purposes, then that's knowledge of what may occur. Yeah. Not only does it say that in this case, but it says that information may be collected using cookies and precisely the technology that's used here. It also discloses that that information may be connected to names and addresses obtained from other sources. It is a plain, vanilla, and very clear common language statement of what happens here. But it's obvious on the website, not tiny little letters. No, it's on a privacy policy that is their own expert testified that the link to it is placed in the standard position on the page, and it doesn't evince any kind of effort to conceal it. And ironically, at the time, there was no obligation outside of a very narrow California statute for anyone to even post privacy policies. The privacy policies were an industry effort to get ahead of these questions so that they could be transparent. Many of these practices, by the way, went on for generations through the mail order industry, which we've been working with for many, many decades. And so this was a new era of telling people that, you know, yes, we collect information about you, and yes, we may use that to market products to you in other channels. And that's done here, Your Honor. Thank you. Thank you, counsel. We'll hear from Mr. Carlshaw, is it? May it please the Court. Paul Carl's guy on behalf of the defendant, Harriet Carter, yes. Not an issue, Your Honor. I get that all the time. I will start with the privacy policy because I think it's important, and clearly the panelists have expressed concern about it. You can see it quoted on page 47 of the Applebee's brief, and it not only says we may use cookies, it not only says your information may be collected, it describes the specific process that is at issue in this case. In other words, it describes specifically what is being done with that. But that's the privacy policy on the website at the time Ms. Popa visited. That's correct. Well, we don't – I mean, isn't that an issue of material fact? It might be correct, I'm not arguing with you on that. But I don't know if that's an undisputed fact. Well, let me start by saying, Your Honor, I don't think it's material because if you follow the district court's analysis, you never get to the question of consent. But if consent is an issue, this is not an undisputed fact because, number one, the witness gave a sworn declaration. The position the plaintiff took is that the witness, when confronted in a deposition about the specific time and date of the document, couldn't remember. That is a far cry from being a refutation that would create a dispute of fact about what existed. They have provided no evidence that – But you don't have a screenshot or anything of it, right, of exactly what the policy was, right? I believe attached to the declaration there was an actual copy of the privacy policy. That would be in the record. Wait a minute. If you don't know what – if you say, I don't know what happened, that obviously doesn't establish a fact. It just means you don't know and a fact needs to be established. Well, I – What was the weather on June 8th, 2019? I don't know. Yeah, I believe, Your Honor, the question posed and the answer given had more to do with a recollection of specific times and dates as opposed to a recollection of whether the policy existed at all and whether it existed at the time Ms. Popa would have accessed the website. I don't think there's any serious contention that this policy existed and that it says what we say it says. Their primary contention is that – I'm not so sure your friend's going to agree with that, but – Well, as he said in his initial argument, their primary contention is that she didn't read it. It wasn't put in her face enough when she accessed the website. Now, I want to say a couple of things particular to Harriet Carter, and the first is Harriet Carter GIFs is not being accused of intercepting anything here. All of these communications by their own admission were intended to go to my client. And so that leads to the possibility that they're alleging some sort of procuring of an interception. But if you look at the procuring language in the statute, that language is clearly intended to cover the situation where, for example, law enforcement gets the telephone company to assist it in accessing someone else's communications. These are all communications that are coming to my client. And so from my client's perspective, regardless of how the statute is interpreted, it doesn't apply to us. And also, if the court affirms on the basis of the interception occurring in Virginia, as the district court found, that is an independent reason that avoids all of the analysis that we've been talking about during argument today. Thank you, counsel. We'll hear rebuttal now. Can I ask you at the outset, why was Harriet Carter made a defendant here? Because they were involved in the procurement of Navistown to intercept the communications between Harriet Carter and POPA. Appendix page 399 to 400 is an excerpt from Navistown's corporate designee. And the question was, so Harriet Carter cannot provide, I'm sorry, Harriet Carter's corporate designee. The question is, so Harriet Carter cannot provide plan for the representation of the privacy policy as it existed in 2018, say March of 2018. The answer, Harriet Carter is unable to provide that. That's correct. Okay, what if I ask for the privacy policy as it appeared in October of 2017? Can Harriet Carter say what its privacy policy was then? No, it cannot. So there's a question of fact here. There are dates, of course, because the dates matter, because we know when POPA was on the website. So we have to figure out what the relevant policy was, and they cannot provide a representation of what that policy was at any time. So it's not just about time and date as has been suggested. That's their representation. That's their representative testifying to that fact. And did this report base any part of its analysis on this consent issue? It did not. Now I'd like to address the parade of horribles, if I could. The fact that a law might be violated en masse is not a defense to a violation. The fact that it might have policy ramifications to some extent only matters for the legislature. Now on the margin, courts consider policy arguments when there's a margin to consider. We're not on the margin here. We have to look at the statute and apply the statute as it's currently enacted. And as it's currently enacted, this is an interception. I mean, this is a garden variety interception. And to try to claim otherwise because of policy reasons, and largely that was the argument I just heard, was policy-based argument that even my own website was in violation of this. That has no relevance to whether or not this defendant is in violation of that statute. And I think that should be obvious enough. The defendants are asking us to accept two concepts here in order to avoid liability under WESCA. The first one is that everyone is a direct party that interacts with a web user on the Internet. So if a web user gets on a website and there's third-party servers coming in from left and right, those are all direct parties and that's just how the Internet works. And we're supposed to accept that. The second proposition they're asking you to accept, and both of these have to be true for them to avoid liability, is that all Internet activity is presumed to be recorded and permanent by nature. If both of those things aren't absolutely true, then they're in violation of the statute because it's a two-party consent statute. It's not the federal wiretap statute. Just being a party itself is not enough. That's not an exception under the state law. You have to have two-party consent. So they have to somehow establish that this is not an interception at all, and the way they've done it, and the way the district court is doing it, is saying, well, they're a direct party, and everybody knows that this type of communication between direct parties is being recorded like an e-mail, like a text message. The problem is there's no Pennsylvania authority that stands for the proposition that all Internet electronic communications are necessarily permanent to the point where they're presumed to be recorded and intercepted. Could you elaborate on one point? How do you get two-party consent? How do you get two-party consent? And you said that there has to be two-party consent. There has to be two-party consent. Two-party consent is obvious enough. The two parties to the communication consent to having the communication intercepted. You mean the person that's calling and then the person who's on the other? They both have to consent? Yes. How do you do that? Well, I give you an example. How do you do it on the Internet? Well, you do it on the Internet easily enough, right? You have the person that wants to intercept it obviously consents to that interception. That's one party. Well, that's implied consent. No, it's the recipient that intends to intercept it. That's consent. So Harriet Carter could consent to having Navistone record the conversation. The sender... When this occurs, what you see is something on a computer screen. I may be speaking, but all I see is a lot of language on the computers. How is that a consent? Yeah, so it's not a consent the way they try to claim it in fashion, which is buried into a policy that you have to navigate down and click on a link that's way at the bottom, and I think as Judge Amber pointed out, everybody knows nobody does that. I mean, that's just everybody knows that. That's not effective consent. That's not even effective solicitation for a consent that involves the statute. You would have to stop the access to the website, have something appear on the screen, and have to be navigated in red and then agreed to affirmatively, and then have to specifically address the consent to intercept for this to be effective. The quantification of the Pennsylvania case law cabins that case law off. The court can't extend the statutory exception because now the exception is statutory. The court cannot extend the statutory exception by analogy, the way it tried to do with the case law. Even if it could use that case law to try to extend it by analogy, that doesn't work here. It's an improper extension. These are completely different fact patterns, as I argued before. The long and short of this is, Your Honors, this is just how the Internet works defense doesn't apply to this fact pattern. This is not the Google case. This is not how the Internet works. This is not how websites are rendered. This is how interceptions are set up. This is how a wiretap occurs on the Internet. That's what this is an example of. Thank you, Your Honor. Anything else? Thank you, counsel. Thank you, counsel. We'll take this case under advisement. And let's get a transcript of this argument. And we ask that the parties split it. And we want to thank counsel for their excellent argument, both oral and written here. Fascinating case.